Roxie E. BOYETTE, a single person, and James W. Boyette, a single person *v.* Ray F.VOGELPOHL and Teresa M. Vogelpohl, husband and wife

CA 04-1153                                                                 214 S.W.3d 874

Court of Appeals of Arkansas
Opinion delivered October 5, 2005

[Rehearing denied November 9, 2006.*]

---

* GLADWIN and GRIFFEN, JJ., would grant rehearing.

*Hartsfield, Almand & Denison, PLLC*, by: *Larry James Hartsfield*, for appellant.

*Barbara P. Bonds*, for appellee.

ANDREE LAYTON ROAF, Judge. Appellants Roxie E. Boyette and James M. Boyette appeal from the trial court's denial of their complaint seeking the establishment of a boundary line by acquiescence, or in the alternative by adverse possession, and the court's granting of the appellees Ray F. Vogelpohl and Teresa M. Vogelpohl's counterclaim to quiet tile. We agree that the trial court erred in quieting title to the disputed property in appellees, and reverse and remand.

Roxie Boyette and James Boyette own property on Highway 10 in Perryville, Arkansas (the Boyette property). Roxie owns the northern section of the property and James owns the southern section of the property. The Vogelpohls own the property situated on the west side of the Boyettes' parcels. At one time all of the property was owned by James Boyette's grandfather. Roxie and her now-deceased husband and James both acquired deeds to their respective parcels in 1994. The Vogelpohls acquired a deed to their property from F.C. Grass Farms Partnership in 1994.

The Boyette property and the Vogelpohl property were divided by a barbed-wire fence that ran the length of the property from north to south. The fence had been constructed at a time when both the west and east tracts were owned by the Boyette family. In July 2000, Troy Laha conducted a survey of the property line between the Boyette and Vogelpohl properties for Roxie Boyette and determined that the true boundary line sits east of the barbed-wire fence line. In 2002, the Vogelpohls began erecting a new fence in accordance with the surveyed boundary line. The Boyettes filed a complaint asserting that the old fence line represented the boundary by acquiescence or, in the alternative, that they had acquired title to the disputed property by adverse possession; the Vogelpohls counterclaimed and requested that the trial court quiet title to the disputed property in them.

At trial, Laha stated that he first observed the barbed-wire fence in April 1998; that it appeared that the fence had been in its present location for a number of years; and that the fence appeared to be virtually undisturbed for a long period of time. Laha also testified, "All indications are, on the ground, is that it [the barbed-wire fence] is being used as a boundary line between the two property owners. The Vogelpohls on the west were occupying up to the fence and the Boyettes on the east side were occupying up to the fence. If I remember correctly, both of them was cutting the grass up to the hedges as close as they could."

Roxie testified that she has lived on the Boyette property since 1965, and has been familiar with the Boyette property since 1960. From her earliest recollection, there has been a fence line running north and south separating the Boyette property from the property to the west, and it has always served as the boundary line between the two properties. The fence also served to keep out their neighbor's livestock and to control their own cattle. Roxie further stated that her family had been mowing the property up to the fence line since 1965, and that, before the Vogelpohls constructed their new fence, it was their custom to mow up to the old fence line. Roxie stated that she has used and claimed the property up to the fence line for "all of these years."

James Boyette testified that he was fifty-seven years old, and that at all times there has been a barbed-wire fence running from the north to the south end of the Boyette property. He stated that the function of the fence was to keep cattle off of their property, but "everybody's always recognized [the fence line] as the boundary line between the two properties." He also said that the owners of the property to the west of their property have claimed ownership of the land up to the old fence line.

Ray Vogelpohl testified that he purchased the property to the west of the Boyette property from F.C. Grass Farms. Before his purchase in 1994, the property had been vacant for a number of years. He admitted that, when he purchased the property, he did not have it surveyed, but that he relied on a survey that had been performed in 1981 that did not show any fences on the property. Vogelpohl testified that the Boyettes' deed also did not reflect the existence of any fences on the property. Vogelpohl stated that he had no reason to believe that the Boyettes were claiming anything other than the property that was described in their deeds; that there was no mention of a fence in their property description; that there is no reference to a fence in his property description; and that the Boyettes never told him that there were claiming anything other than the property that was actually described in their deeds.

Vogelpohl stated that after purchasing the property, he and his wife began to repair the property and restore it to a livable condition. He stated, "We'd maintain what we could on our side to keep the horse in. We're not concerned about the other side until we could at least get to place a proper fence there, which we did in 2002." He testified the weeds on both sides of the fence had grown up six to seven feet tall.

When asked to describe what action he had taken between 1994 and 2002 to indicate his exercise of dominion and control over the property in dispute, Vogelpohl responded that he was relying on the documents that Roxie had filed. He also stated that, because the north end of the fence was quite overgrown, he had the hedgerow taken down both sides of the north end of the fence and painted both sides. He maintained that he did not accept the fence line as the property line; that he painted and maintained the fence; and that he paid taxes on his property.

The trial court entered an order dismissing the Boyettes' complaint with prejudice and granting the Vogelpohls' counter-claim. In the order the trial court found in pertinent part:

> The existence of a fence between adjoining landowners is not sufficient to create a boundary line by acquiescence, there must be mutual recognition of the fence as a dividing line.
>
> As the fence was erected during the period of time when one common owner owned all of the parties' respective real property, the fence could not have been erected as a dividing line.
>
> It is clear from the testimony and evidence presented that there was no mutual recognition of the fence as a dividing line between the parties to this action.
>
> There was no testimony or evidence presented concerning any mutual recognition between the plaintiffs and the defendants' predecessor(s) in interest.
>
> Any occupation of the disputed strip was subordinate to that of the holder of the legal title.

Although boundary line cases are reviewed *de novo* on appeal, we will affirm a trial court's finding of fact with regard to the location of a boundary line unless the finding is clearly erroneous. *Hedger Bros. Cement & Materials, Inc. v. Stump*, 69 Ark. App. 219, 10 S.W.3d 926 (2000). A finding is clearly erroneous when, although there is evidence to support it, we are left, after considering all of the evidence, with the definite and firm conviction that a mistake has been committed. *Id.* Whether a boundary line by acquiescence exists is to be determined upon the evidence in each individual case. *Id.*

The facts in this case are similar to those in *Summer v. Dietsch*, 41 Ark. App. 52, 849 S.W.2d 3 (1993), in which the appellant appealed from the trial court's decision that an old fence line did

not constitute a boundary by acquiescence, nor did appellant gain title to the property by adverse possession. In *Summer*, the appellant's father had purchased forty acres of land in 1943. In 1954, he deeded the east thirty acres to appellant's grandfather, and in 1970, he deeded the remaining ten acres to appellant. In 1970, the grandfather deeded his thirty acres to a person outside the family, who subsequently deeded fifteen of these thirty acres to appellees. Appellees then shared a common north-south boundary with appellant's ten-acre tract. During all relevant times, a fence divided appellant's land from appellees', and the fence had been in existence for at least forty years. Both parties used their property up to the fence line, and both appellee and appellant maintained the fence. When appellees' 1991 survey reflected that the fence was approximately forty feet off the actual property line, they began construction of a new fence and filed for injunctive relief. Appellant responded that the old fence line was the long-established boundary line by acquiescence, and also contended that he had acquired title by adverse possession.

On appeal, this court reversed, holding that the trial court's finding that the old fence line had not become the boundary line by acquiescence was clearly erroneous. We stated that boundaries are frequently found to exist at locations other than those shown by an accurate survey of the premises in question and may be affected by principles of acquiescence and adverse possession. A fence, by acquiescence, may become the accepted boundary even though contrary to the survey line. The general rule is that, when adjoining landowners silently acquiesce for many years in the location of a fence as the visible evidence of the division line and thus apparently consent to that line, the fence line becomes the boundary by acquiescence. *Id.* (quoting *Tull v. Ashcraft*, 231 Ark. 928, 929–30, 333 S.W.2d 490 (1960)). The court also quoted from *Kittler v. Phillips*, 246 Ark. 233, 236, 437 S.W.2d 455, 456 (1969):

> The appellant ably argues that to establish a boundary line by acquiescence there must be a mutual or expressed agreement of the dividing line. However, in [a previous case] we said: It may be conceded, as claimed by appellant, that there never was any express agreement to treat the fence as the dividing line between the two parcels of land. Such an agreement, however, may be inferred by the action of the parties.

Moreover, it is well established that whenever property owners tacitly accept a fence line or other monument as the visible evidence of their

dividing line for a long period of time and thus apparently consent to that line, the line becomes the boundary line by acquiescence. *Summers, supra.* The property owners and their grantees are then precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one, although it may be on the survey line. *Id.*

■ Here, the Boyette fence has been in existence for more than forty years. The trial court found that, because the fence had been erected when the first Boyette owner owned all of the property in question, the fence line could not be considered a boundary line by acquiescence. However, the Boyettes testified that the Vogelpohls' parcel had been deeded outside the family sometime in the 1950s. The trial court's finding is contrary to the *Summers* holding and is clearly erroneous. Although not expressly stated in the *Summers* opinion, the fence in question was also in existence at a time when Summers owned all of the property. It is of no consequence that the fence line was not originally erected to serve as a boundary line. It is the conduct of the parties that is important when reviewing a boundary line by acquiescence case. In this case, both parties used their respective properties up to the fence line, and the Vogelpohls made no claim to the disputed property until 2002, when they began building a new fence, eight years after they acquired their property. In fact, Ray Vogelpohl stated that he had relied on an old survey until Laha performed the new survey in 2002. Although Vogelpohl testified that because he repaired the fence on the northern end of the property and painted both sides, he never acquiesced to the fence line as the boundary line; however, his conduct shows otherwise. Vogelpohl never used any of the property east of the fence line, and admitted that he took care of the weeds on his property and the Boyettes took care of the weeds on their property, but that the middle was overgrown. Laha and James Boyette testified that the parties had mowed their respective properties up to the fence line. Accordingly, we find that the parties' conduct shows that the Vogelpohls silently acquiesced in the fence line as the boundary line and that the Vogelpohls did nothing until 2002, which was eight years after they took possession of the property.

■ The trial court also found that there was not mutual recognition of the fence line as the boundary line. In *Fish v. Bush*, 253 Ark. 27, 484 S.W.2d 525 (1972), the supreme court stated that, in order to have a boundary line by acquiescence, the

adjoining land owners must recognize the fence as the boundary line, and there must be mutual recognition. The trial court found that there was no mutual recognition in this case. This finding is also clearly erroneous. Vogelpohl argues that he did not recognize the fence line as the boundary line and that he did not assent to the fence line as the boundary line because he relied on a previous survey. Again, the Vogelpohls never expressly asserted claim to any of the property east of the fence until 2002. The Boyettes used and mowed the property on the east side of the fence line, and the Vogelpohls only used up to the fence line on the west side. Mutual recognition is not an expressed agreement, and in fact, an expressed agreement is not required when the parties silently acquiesce. *See Summer, supra.*

■ The trial court also found that the mere existence of a fence between two adjoining parcels of land does not in and of itself sufficiently demonstrate a boundary line by acquiescence. *See Carney v. Barnes,* 235 Ark. 887, 363 S.W.2d 417 (1963) (mere fence not sufficient, must show mutual recognition). While this is a correct statement of the law, the evidence shows not merely a fence, but reflects mutual recognition and silent acquiescence.

■ We also conclude that the Boyettes established a claim of adverse possession to the disputed property. In order to establish a claim for adverse possession, a party must prove that he had possessed the property in question continuously for more than seven years and that the possession was visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *McWilliams v. Schmidt,* 76 Ark. App. 173, 61 S.W.3d 898 (2001). The Vogelpohls contend that the Boyettes' claim of adverse possession fails because they have not complied with Ark. Code Ann. § 18-11-106, in that they failed to present proof that they paid *ad valorem* taxes. *See Schrader v. Schrader,* 81 Ark. App. 343, 101 S.W.3d 873 (2003). However, the statutory requirements for adverse possession were amended in 1995, requiring the party seeking adverse possession to show color of title and payment of taxes in addition to all of the elements necessary under existing adverse possession. *Id.* In *Schrader,* the court held that if the claimant's action accrues before 1995, the effective year of the amendment, then requirement of payment of taxes is not necessary. *Id.* In this case, the Boyettes have openly and continuously used and occupied the property on the east side of the fence line since the 1960s, thus their adverse possession claim would have

accrued well before 1995. For the reasons stated above, we find that the Boyettes also established a claim for adverse possession.

Reversed and remanded for entry of an order quieting title in the disputed property to the Boyettes.

GLOVER, NEAL, and BAKER, JJ., agree.

GLADWIN and GRIFFEN, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. The majority has reached a result in this case that violates the standard of review in boundary-dispute cases. This court reviews such cases *de novo* on the record; however, it is not to reverse unless the circuit court's findings of fact are clearly erroneous. *Robertson v. Lees*, 87 Ark. App. 172, 189 S.W.3d 463 (2004). In other words, this court is not to reverse a circuit court's findings on a boundary-dispute case unless it "is left with a definite and firm conviction that a mistake has been committed." *Carson v. County of Drew*, 354 Ark. 621, 625, 128 S.W.3d 423, 425 (2003). We do not decide these cases as if we are the triers of fact. Yet, this is precisely how the majority has reasoned its way to reverse the trial court.

Through acquiescence, a fence may become the accepted boundary line between two parties even though it is contrary to the surveyed boundary line. *Robertson v. Lees, supra*; *Summers v. Dietsch*, 41 Ark. App. 52, 849 S.W.2d 3 (1993). The mere existence of a fence, without evidence of mutual recognition, cannot sustain a finding of a boundary by acquiescence. *Warren v. Collier*, 262 Ark. 656, 559 S.W.2d 297 (1978); *Robertson v. Lees, supra*. Silent acquiescence is sufficient, as the boundary line is usually inferred from the parties' conduct over so many years. *Warren v. Collier, supra*; *Hicks v. Newton*, 255 Ark. 867, 503 S.W.2d 472 (1974). A boundary by acquiescence may be established without the necessity of a prior dispute or adverse use up to the line. *Rabjohn v. Ashcraft*, 252 Ark. 565, 480 S.W.2d 138 (1972); *Lammey v. Eckel*, 62 Ark. App. 208, 970 S.W.2d 307 (1998).

For a party to prove that a boundary line has been established by acquiescence, that party must show that both parties at least tacitly accepted the non-surveyed line as the true boundary line. The mere subjective belief that a fence is the boundary line is insufficient to establish a boundary between two properties. *Webb v. Curtis*, 235 Ark. 599, 361 S.W.2d 87 (1962).

Plainly, the Boyettes merely assumed that the old fence line was the boundary line because both parties maintained their

property up to the fence. The Boyettes' allegedly longstanding recognition of the old fence as the established boundary line is undercut by the fact that they did not designate the fence as the boundary line in the 1994 quitclaim deeds. Further, Ray Vogelpohl testified that he never recognized the old fence as the boundary line and that the surveys he relied upon did not reflect any fences on the property. Because our standard of review requires this court to be deferential to the circuit court's determinations of credibility and weight to be accorded testimony, *see* *Carson v. County of Drew, supra*, there is no valid evidentiary reason for the majority to hold that the circuit court erred.

The majority has also over-relied on *Summers v. Dietsch, supra*. The following excerpt represents that court's rationale for reversing the lower court's finding that a boundary had not been established:

> In this case, it is undisputed that the fence had been in existence at the same location for over forty years. During at least the twenty-one years of appellant's ownership, neither appellees nor their predecessors ever objected to appellant's use of all of the property west of the fence. Rather, the owners of each tract of land used the property on their respective sides of the fence, up to the fence line. The evidence indicates that both appellant and appellees helped maintain the fence. Although appellee Dietsch testified that he thought as early as 1980 that the fence was on his property, he also testified that he did nothing about it until commencing this action in 1991. By their actions, the parties and their predecessors have accepted the fence as the existing and physical boundary line for at least twenty years without question or objection. Appellees' actions belie their contentions to the contrary.

*Id.* at 56, 849 S.W.2d at 5-6.

At least three facts distinguish *Summers* from the present case. First, the appellee in *Summers* acknowledged that the fence was recognized as the boundary. Vogelpohl testified, in contrast, that he never recognized the fence as the boundary. Second, the appellee in *Summers* testified that he thought as early as eleven years prior to the litigation that the fence was on his property. The surveys in the instant case do not show the fence as a boundary line or that the fence was even on the property. The majority seems to believe that Vogelpohl's reliance on the old survey supports a finding that he acquiesced to the fence as a boundary; however, Vogelpohl testified that the survey showed no fences on the

property and that he had no reason to believe that the Boyettes were claiming anything other than what was in their deeds. Finally, both parties in *Summers* helped maintain the fence. Such evidence is absent here. In fact, Vogelpohl did nothing to the fence until he noted that it was not on the surveyed boundary line. He then removed the fence.

The majority's interpretation of the evidence in this case is also internally inconsistent. The majority states that the evidence in this case "reflects mutual recognition and silent acquiescence." Recognition and acquiescence are two different things: the former requires express acceptance, while the latter requires merely tacit acceptance. *See Black's Law Dictionary* 25, 1299 (8th ed. 2004) (defining "acquiescence" as "A person's tacit or passive acceptance" and "recognition" as "The formal admission that a person, entity, or thing has a particular status"). For the majority's interpretation of the evidence to be correct, the Vogelpohls would have had to do some act recognizing the old fence as the boundary line while passively agreeing to the fence as the boundary line. In a proper standard of review, this court cannot hold that either, much less both, existed.

In re-weighing the evidence and holding that appellants did establish a boundary line by acquiescence, the majority has effectively declared the deeds useless. A deed that indicates the true boundary lines is rendered meaningless if a party can change those boundaries by merely assuming that another line must be the boundary. Every relevant document in this case established or referred to the surveyed line as the boundary line. Yet, with apparent disdain for that body of proof, the majority has reached its decision.

I also disagree with the majority concerning the adverse-possession argument. First, the majority opinion essentially makes the argument for the Boyettes. Much of the Boyettes' original and reply briefs are devoted to the boundary-by-acquiescence issue. In their main brief, they merely state the elements of adverse possession. In reply, they only respond to the Vogelpohls' assertion that the requirements of Ark. Code Ann. § 18-11-106 (Repl. 2003) (requiring the payment of taxes) were applicable. The Boyettes' failure to develop this point should have been reason enough to affirm on their adverse-possession theory. *See Johnson v. Encompass Ins. Co.*, 355 Ark. 1, 130 S.W.3d 553 (2003). Instead, the majority opinion erroneously concludes that the circuit court should have ruled in the Boyettes' favor on this point.

When considering an adverse-possession claim, a court presumes that possession of land by someone other than the true owner is *subservient* to that of the true owner. *See Fulkerson v. Van Buren*, 60 Ark. App. 257, 961 S.W.2d 780 (1998). Further, it is well-settled that a person does not lose title to land simply by placing a fence within his boundary; such a loss occurs only if his neighbor takes possession of the strip and holds it for the requisite number of years. *Brown Paper Mill Co., Inc. v. Warnix*, 222 Ark. 417, 259 S.W.2d 495 (1953); *Avington v. Newborn*, 271 Ark. 648, 609 S.W.2d 678 (Ark. App. 1980). The majority should not hold that this presumption was overcome simply because appellants maintained the lawn on their side of the fence, especially in light of evidence that no previous survey or deed (particularly the 1994 quitclaim deeds drafted by Roxie Boyette) showed that the land belonged to the Boyettes.

Finally, I am troubled by the fact that the majority found reason to reverse on both theories. Cases involving a boundary by acquiescence involve the peaceful possession of lands up to the acquiesced boundary. *Council v. Clark*, 246 Ark. 1110, 441 S.W.2d 472 (1969); *Avington v. Newborn, supra*. Acquiescence requires *mutual* recognition of a boundary line. *Rabjohn v. Ashcraft, supra*. In other words, parties on both sides of the acquiesced boundary must accept the line as the true boundary between the parties. Meanwhile, adverse possession requires *hostile* possession of property with the intent to hold that property in derogation of the rights of the true owner. *Bonds v. Carter*, 348 Ark. 591, 75 S.W.2d 192 (2002). While hostile ownership does not require conscious feelings of ill will or enmity toward one's neighbor, *Walker v. Hubbard*, 31 Ark. App. 43, 787 S.W.2d 251 (1990), it does require possession of land that the neighbor claims as his own.

Boundary by acquiescence and adverse possession are two alternate, yet competing (if not mutually exclusive), theories. By holding that both existed in this case, the majority has stated that the Boyettes claimed land to which the Vogelpohls had recognized no claim while simultaneously claiming land to which the Vogelpohls had made a claim. The inconsistency in the logic is apparent, and the dual holdings make no sense. I suspect that law students and law professors in real property classes will find these holdings amusing, but I cannot understand how this decision will make sense to lawyers who must counsel litigants.

For the reasons stated herein, I must respectfully dissent. I am authorized to state that Judge GLADWIN joins in this dissent.